ADJUDGED IN

# THE COURT OF CHANCERY

## OF THE STATE OF NEW JERSEY.

### OCTOBER TERM, 1869.

| 20 | 159 |
|----|-----|
| 50 | 770 |

## THE NATIONAL BANK OF THE METROPOLIS *vs.* SPRAGUE and others.

1. A sheriff or master charged with the conduct of a judicial sale, has a considerable latitude of discretion in prescribing such terms of sale as will exclude puffers and fraudulent bidders, and secure the confidence of real purchasers in offering their bids.

2. The sale by a master of an extensive hotel at a summer watering place, of large value, will not be set aside, because a bidder was required, before his bid was accepted, to deposit $5000, that being less than the ten per cent. required to be paid by the purchaser—the property being so situate as to attract bidders from a distance, whose character and solvency would be unknown, and the requirement being justified by the fact that a sale of the property on a previous day was prevented by the inability and refusal of the bidder to whom it was struck off to comply with the conditions; nor because, at the adjourned sale, the price realized was $97,500, the bid at the first sale at which it was struck off having been $150,000, it appearing that some of the bidders at the first sale, including the one to whom the property was struck off, were puffers, and unable to pay the ten per cent. to be paid down, and that one, who, if he was a *bona fide* bidder at $130,000 at the first sale, and could have complied, did not bid at the second sale.

3. The employment of puffers by an owner of property offered for sale at auction ; or, in the case of a judicial sale, by creditors, in whose behalf property is offered for the purpose of increasing the price by fictitious bids,

National Bank of the Metropolis *v.* Sprague.

is a fraud upon honest bidders; and a buyer at such a sale may be relieved from his purchase.

4. It seems that the fact of a puffer having bid at the sale will not avoid the sale, if, after the bid of the puffer there is a bid by a real purchaser before the bid at which the property is knocked down; but that in all cases where the bid next preceding is that of a puffer, the sale is voidable by the purchase. *Query.* Whether it would not be more just, in all cases where sham bidders are employed by those interested, to enhance the price, to hold that this is a fraud upon purchasers, and that the sale is void.

5. When a bidder, at a master's sale, declares to the master that he is not prepared to comply with the terms of sale, it is not improper for the master to refuse his application for leave to withdraw his bid, and to direct the property to be struck off to him, and thereby to compel him to announce openly that he cannot comply.

6. It is not unlawful for persons who wish to make a joint purchase of property about to be offered at auction, to agree together that they will authorize one person to bid for it upon their joint account.

7. It is illegal for persons intending to purchase at auction, to combine not to bid against each other; but the rule is confined to cases where there is an agreement not to bid, and does not extend to cases where several persons join to make a purchase for their common benefit, without an agreement not to compete, or to a case where several creditors, no one of whom would be willing to purchase a property of very large value, unite to purchase.

8. The fact that an agreement to make a joint purchase may indirectly operate to prevent the parties from competing, is not enough to render the transaction unlawful; to have that effect it must appear that the object of making the agreement was to avoid competition.

9. When personal property, such as the furniture of a hotel, is to be sold by a receiver, under a decree of this court, the question whether it shall be sold in bulk or by parcels, is within the discretion of the officer. If his discretion was fairly exercised, the sale will not be set aside because the court may think that a better price would have been realized by a different mode.

10. At a judicial sale, where the value of the articles, or a considerable part of it, does not consist in their constituting one establishment, and where there would be purchasers to bid on them separately, the general rule is to sell them separately. But where their value, as constituting a whole establishment, is greater than when separated, and where the articles, when separated, would not excite competition, it is more advantageous to sell as a whole.

11. A sale by a receiver, of the furniture of a hotel, immediately after a sale of the land and hotel thereon, made in the fair exercise of the receiver's discretion, ought not to be set aside because the furniture was not on view at the time of the sale, but was locked in the rooms of the hotel, it

not appearing that any one who desired to inspect it before the sale was refused leave; nor because a printed catalogue was not furnished to bidders; nor because a brief time was set for the removal of the property by the buyer, it appearing that a necessity existed for a prompt delivery of possession of the building to the purchaser of that.

This matter came up on petition of the complainant to set aside the sale of the real estate sold by the master, by virtue of a *fieri facias* directed to him on a decree of foreclosure, and also to set aside the sale of the personal property of the defendants, Sprague and Stokes, sold by the receiver in this cause, pursuant to an order of this court. A rule to show cause was granted, and depositions were taken on both sides, in pursuance of the directions in the rule.

*Mr. T. N. McCarter*, for complainant.

*Mr. F. T. Frelinghuysen*, for defendants and purchaser.

THE CHANCELLOR.

The complainant was a judgment creditor of C. C. Sprague, by the decree in this cause adjudged to be of the firm of Sprague & Stokes, who were the owners of the Continental Hotel, at Long Branch, and the furniture in it. Other suits brought to foreclose mortgages given by Sprague & Stokes, some upon the real estate and others on the furniture, which were pending in this court, were, by order of the court, consolidated with the suit of the complainant.

On the hearing of the consolidated suits, the mortgages on the real and personal estate, and the judgments on lien claims, and other judgments, were adjudged to have priority in the order specified in the decree, over the judgment of the complainant; that was held to bind only the interest of Sprague in the partnership property, which is only one half the surplus after the debts of the partnership should be paid, and the other debts being debts of the firm, were adjudged to have precedence.

o*

The master, who was also the receiver in the suit, advertised the sale of the real and personal property to be held on the premises, on the 18th day of May, 1869, and then offered the real estate for sale. It was bid up to $150,000, by T. M. Davis, a counselor-at-law, of the state of New York, who had acted as the counsel of the complainant, and was attending the sale as the agent of the complainant. The real estate was started at a bid of $100,000, and run up by bids to $150,000. After $125,000 the bids were an increase of $5000, at each bid; S. Laird bid $130,000; some one not known bid $135,000 ; Davis then bid $140,000; some one not known then bid $145,000, and then Davis bid $150,000. Finding that the party against whom he had been bidding did not intend to bid more, Davis, before the property was struck off, told the master that he was not prepared to comply with the terms of sale, and requested to have his bid withdrawn. This the master, upon consultation with such of the creditors as were present, refused to permit him to do. The crier struck off the property to Davis at his bid, and he refused to comply with the terms of sale, or to acknowledge the purchase. The master then again put up the property for sale, but added to the conditions a requisition that each bidder should deposit with him $5000 in cash, before his bid would be received, which at the close of the sale would be taken as part of the ten per cent. required in cash if the property should be sold to him, and if not, would be returned to him. Alexander M. White bid $91,000, and offered his check on some bank for $5000 as the deposit. This the master, not knowing the responsibility of White, refused to receive. Upon his remonstrating, one of the creditors remarked as evidence of his pecuniary responsibility, that he had not paid up his board bill for the previous summer. Harsh words and blows ensued between White and this creditor, and a general confusion arose, which induced the master to adjourn the sale to May 26th; this he did with a notice that he would require the same deposit for receiving a bid as he had exacted. On the 26th of

May the property was put up for sale, and struck off and sold for $97,500, to Andrew Kirkpatrick, as the agent for a large number of the creditors who had agreed to bid for it. Two persons were there who testify that they came to bid for the property, and would have bid a larger amount, if their bids would have been received without the deposit of the $5000. Neither of them had with them any money to make that deposit, or to pay the ten per cent. required to be paid upon the property being struck off. One testifies that he was authorized to draw for the amount upon his principal, but refuses to disclose the name of the principal, or whether he was present at the sale. The other says he was prepared to pay the amount at the close of the sale, by having blank checks in his pocket upon a bank in Philadelphia, in which he had no funds and had never had an account, but in which he expected the funds would be by the time the master could get the check there.

The grounds on which the application to set aside this sale was placed, were first, that the unusual terms imposed by the master in exacting the $5000 deposit, deterred bidders, and caused a sacrifice of the property; and second, that the combination of the creditors to purchase it together, was against the policy of the law, as preventing the competition which would have ensued from bidding separately.

The personal property, which consisted of the furniture of the hotel, was sold in bulk for $33,000. The grounds for setting aside that sale were first, because it was sold in bulk and not in parcels, or by the single article; second, because the articles were not at the sale exposed to view so that purchasers could examine them, but were kept in the rooms where they belonged, and no printed catalogue was furnished to purchasers; and third, because the ten days allowed for removal was too short a time to accomplish the removal.

First, as to the sale of the lands: a sheriff or master may adopt such stringent or unusual terms of sale, as may injure

the sale and prevent the fair competition necessary to an auction sale. But within these limits he must exercise his own discretion as to the terms; these must necessarily vary according to the circumstances of the case. In this case, the hardship complained of was the exacting of a deposit of $5000 from each purchaser as a condition of his bid. This is no doubt an unusual condition; it should not be exacted, unless in the opinion of the officer it is necessary or expedient to secure a fair sale, and the confidence of real purchasers in offering their bids.

This was a large property worth from $100,000 to $200,-000, which all agree was required to be sold in one parcel. It was a large hotel, at a summer resort, which is of no value except for two or three months in the year, and of hazardous value for any one not qualified to manage it by keeping a hotel. The amount required for the purchase was beyond the means of any one except the most wealthy, and of almost every one who would be inclined to invest in such property as this; scarcely any person or combination of persons in the immediate neighborhood or known to the master, could be expected to purchase. The purchasers would naturally be capitalists from the large cities, or hotel keepers by occupation, attracted by the advertisement and situation of the property. In such case the officer is necessarily bound to take greater precaution to insure the performance of the conditions, than in the sale of small farms or tracts which many are able to purchase, and where the purchasers are for the most part well known residents. The first terms of the sale on the 18th of May, were not unusual, except that the time given for the completion of the payment was very properly extended to an unusual period. The property at the first sale would probably have brought a much larger price than it eventually sold for, if it had not been for the improper and fraudulent interference of Mr. Davis, the agent of the complainant. I say *probably*, for it is not clear, but that his interference induced Laird, as well as the other bidders, (if there were any besides the creditors represented by

Kirkpatrick,) to bid higher than they would at a fair auction.

Davis, beyond question, had a right to retract his bid at any time before the property was struck off to him.    But I am not prepared to say that the master acted improperly in not assenting to the withdrawal, and in directing the crier to knock the property down to him at his bid, and requiring him publicly to refuse to comply with the conditions of sale. Davis had at no time been a *bona fide* bidder, he did not come prepared to comply with the terms of sale, and would, at no stage of the sale, have complied with them.    He represented the complainant, who, by the terms of the decree, could only realize anything on the sale by a price beyond that which he was willing to give.    In such a sale the officer has no interest; he is not the owner of the property; but the creditors as well as the debtor, are the real owners, for whose benefit the sale is had, and the sale is affected by their fraudulent conduct.    At a sale by auction, puffers employed by the owner are a fraud upon the buyers, and they will be relieved from any purchase affected by these false bids.    How far the rules of law will extend this avoidance, is not settled by the decisions and authorities.    I am much inclined to adopt as the result of the authorities, the view taken by Mr. W. W. Story, in his treatise on Sales, § 482; that the fact of a puffer having bid at a sale, will not avoid the sale, if, after the bid of the puffer there is a bid by a real purchaser before the bid at which the property is knocked down; but that in all cases where the bid next preceding is that of a puffer, who is bidding to run up the price without any intention to pay, the sale is void.    It would, perhaps, have been more just to hold in all cases where sham bidders are employed by those interested, to enhance the price, that it is a fraud upon purchasers, and that such sale is void.    The proper plan to save the sacrifice of the property in sales not judicial, is, that the owner should reserve the right to make one bid, or should put it up at the lowest price at which he is willing to sell; then it is a fair

auction, though perhaps few would be willing to bid. But if the owner or those interested in the sale should announce that puffers for them would bid in the guise of real bidders, no one at all would bid.

If what was done in this case by Davis stealthily and in disguise had been announced or known, that is if he had proclaimed that he was bidding on the property to run up the price only, not a bid would have been offered in competition with him. Every one would have denounced the fraud, and retired. Whether it is regarded by law as a fraud or not, it is a moral fraud, and a deception upon *all* who bid at an auction sale in the belief that it is what it pretends to be, a sale by competition among real purchasers. And in this case the master could not with due regard to principle, after Davis disclosed to him that he was a mere puffer, and his bids a sham, allow the sale to proceed on the bids already given without exposing the fraud of Davis to the other bidders; and it seems to me that this was best done by refusing to accede to the private request made by him to allow his bid to be withdrawn, and by compelling Davis openly to refuse to comply with the terms of sale. It was his duty not to conceal from the purchasers the fraud practised to the full extent to which it had come to his knowledge. Davis' conduct is not palliated in my view, by the fact that he had learned on a conference with the creditors, who concluded to purchase, to which he was admitted, that they were willing to bid $175,000 for this property and the furniture, or for this property alone, as he mistook their determination to do. Every purchaser limits himself in the price to which he will bid at a fair auction, but may not therefore be compelled to bid that price by fraudulent and sham bidding. In the city of New York, these mock auctions have become as notorious as shop-lifting and pocket picking and other practices of the kind, and the way in which the unwary are robbed, is the simple device of false bidders or puffers of the kind we find at this sale.

The master had reason after this avowal of Davis, to

National Bank of the Metropolis *v.* Sprague.

adopt some means to prevent sham bidding, and to assure purchasers who were willing to bid at a fair auction, but not otherwise. He adopted the plan of requiring each bidder to deposit $5000 as a guaranty of the good faith of his bid, and I am not prepared to say that it was an improper exercise of his discretion. I am satisfied that it was necessary to do something to give confidence, and to enable the sale to go on ; and it is not easy to suggest a better plan. It could not prevent any one from bidding on account of not having the funds. No one could have bid unless prepared within a few minutes to put up a larger sum, that is ten per cent. on the sale, and this was to be taken as part of that sum, and was not in addition to it. It was a true test of the *bona fides* of a bid. One who was not able to carry out his bid, could not, and one who was not willing would not comply with it ; all others both could and would. And the idea that a purchaser would be deterred by the apprehension that the master might not return the money at the close of the sale, seems to me to be too far strained to be entertained ; the like reason, to a greater extent, would hold against the payment of the ten per cent. I do not think the condition as uncalled for under the circumstances of this case ; and besides it does not appear or seem probable that the condition in any way injured the sale. No one was deterred or prevented from bidding, who would have bid without it. White, who offered to bid on the 11th of May, does not appear to have been able or willing to purchase ; there is no evidence to that effect. He was in the same interest as the complainant who was represented there by Davis. It appears by the evidence in the cause, that he is the endorser on the notes for Sprague, for which the complainant obtained judgment, and has an interest in the payment of them by Sprague. He either could have put up the $5000 deposit, or could not have paid the ten per cent. His declining to put up the deposit is persuasive proof that he could not pay even that ; and his offering his own check on a distant bank, to an officer who was a stranger to him and his

credit, with nothing to assure the officer of the availability of the check or its drawer, except his own affirmation that it was good, and his subsequent conduct, does not weaken the impression with regard to him.

I think no one, after reading their depositions, can for a moment suppose that either Hall or Borneau were in any way *bona fide* bidders or purchasers. If they had intended to purchase, they were not prepared to pay the ten per cent., and could not have purchased; so that they could not have been prevented from purchasing, but only from bidding, by the requisition complained of.

There is besides no proof whatever in the case that any purchaser, able to pay, would have given more for the property. S. Laird is the only name of a bidder given who bid more for it. If he was a *bona fide* bidder he was prepared to pay $13,000, and was not deterred by the requisition of $5000. He could have bid at the second sale, but did not. If a *bona fide* bidder, he would seem to have been driven off by the exposure of the conduct of Davis, and not by the requirement of the master. I, therefore, see nothing in this condition required by the master, that should invalidate the sale.

The other objection is, that the creditors who purchased, by combining to bid together and to purchase for their joint account, contravened thereby the policy of the law, which holds any contract to prevent competition at auction sales illegal, and as such to avoid all purchases made under it.

There is no doubt that it is illegal for two purchasers, or intended purchasers at an auction sale, to combine not to bid against each other, and to divide in any way the profits of purchases made under such an agreement. But all the authorities and decisions in this matter which have been brought to my notice are confined to cases in which there is an agreement between the parties not to bid or enter into competition to bid against each other, and where this agreement is the foundation of the combination to purchase for their common benefit. And the principle upon which the

rule is based would apply only to such cases, and not to cases where parties joined to make a purchase for their common benefit without an agreement not to compete, although the effect of such joint purchase might be to prevent competition. The members of a firm may unquestionably agree, that in a purchase to be made at auction for the firm, only one shall bid, and the others shall abstain, though present at the sale. So if two country merchants, in the same village, should agree that one should attend an auction sale of flour in a distant city, and should purchase two hundred barrels to be divided between them, it would not be illegal, though the effect might be that instead of each bidding in competition with the other for one hundred barrels, the purchase would be made with less competition and at a lower price. Or if at an auction sale of sugars by the hogshead, two persons, neither of whom wanted to purchase or would purchase a whole cask, were to agree that one should purchase for the common benefit, such arrangement is not against public policy, for, instead of preventing competition, it brings in a bidder who would not otherwise be one. To make such agreement illegal, it is necessary that there should be an agreement not to compete, and that the object of making the agreement should be to avoid competition; it is not sufficient that such is the effect of the agreement.

In this case it does not appear that any one of the creditors who agreed to purchase for their common benefit, would have been willing or was able to purchase on his own account. It is not probable that any creditor whose debt was only a few thousand dollars, would involve himself in the purchase of this property, at any price approaching its value, for the purpose of securing his debt. Had they, or any other persons who had contemplated purchasing the property, combined to purchase it on joint account for the purpose of avoiding the consequences of competition, the case would have been within the rule. And it seems to me that creditors in a case like this, should be permitted to unite, because it is calculated to enhance the price, and not

to injure the sale. It brings to the sale a powerful bidder, who is interested in the price being raised to all other bidders. There is no decision that extends the rule to such a case as this, and, in my opinion, it is not within the principle on which the rule is founded, and there is no reason to disturb the sale on this ground.

As to the personal property, it is a matter to be left to the discretion of the receiver whether the sale should be made in bulk or by parcels; in some cases and under some circumstances one way would be most advisable, which in others would be ruinous. In this case, the discretion entrusted to the receiver has been in good faith exercised by him, and the sale ought not to be set aside, because this court might differ from him in opinion as to which was, in this particular case, the best mode of selling. Few large sales take place in which there is not room for a difference of opinion as to some part of the proceedings; and it would have a disastrous effect upon judicial sales, if their validity was made to depend upon every tribunal which has the power of review, agreeing with the officer in the exercise of that discretion. There is no rule of law which requires that each article of personal property should in all cases be sold separately; where the value of the articles, or a considerable part of it, does not consist in their constituting one establishment, and where there would be purchasers to bid on them separately, the general rule is to sell them separately; but where their value, as constituting a whole establishment, is greater than when separated, and where the articles, when separated, would not excite competition, it is more advantageous to sell as a whole. I am inclined to think, both from the evidence and the result of the sale, that the course taken by the receiver in this case was wisest. 1 do not think that there would have been at that place sufficient competition for the articles separately to have insured a good sale. The competition between the actual purchasers and other bidders, who bid with a view to disposing of the articles at a profit, I have no doubt was a better guar-

anty of a fair price. The depositions of several persons present, that in their *opinion* the sale would have been better if by parcels, is no proof that it would be so. It would be strange if a number of witnesses could not be found who, on a nice question like this, did not differ from the receiver. But there is nothing in the facts or reasons given by these witnesses to incline me to coincide with them.

As to the furniture being in the house, and not in view at the time of the actual sale, it is of no consequence. It would have been folly to have torn up the furniture and put it in one heap upon the lawn, which is the only way in which it could have been all placed in view at once. In cases of a sale like this, all real purchasers will examine the stock of furniture before the sale, or day of sale. No one could do it at that time, and any one alleging that he wanted to examine it for that purpose, would have been permitted to inspect it. The doors were properly closed at and just before the time of sale to prevent the crowd from going everywhere through an establishment so large that guards could not have been stationed in each part. And it does not appear that any one who asked for permission to inspect with a view to purchase was excluded.

A printed inventory or catalogue might, and perhaps would have been an advantage in such a sale; but a sale fairly made to a *bona fide* purchaser, who has paid the purchase money, will not be set aside, because it appears that something could have been done that was not done, which would probably have aided the sale; under such rule no judicial sale would stand.

As to the objection that ten days was not sufficient time to remove the property from the premises, I do not think it true; it would, no doubt, have been inconvenient, and would have required great activity to remove the property in that time. But it was necessary that the hotel should be delivered to the purchaser in a short time; any considerable delay would have greatly injured the sale. And the receiver had no power to keep from the purchaser of the hotel at the

master's sale, the possession of the building for the purpose of storing these goods, unless the right was reserved at the master's sale; this it was not advisable to do.

I do not see, in the sale by the receiver, any violation of any rule or requirement of law; nor is there anything in the proof to satisfy me that if he had pursued a different course, the sale would have produced larger prices; much less is there any clear or gross mistake in the exercise of his discretion, such as would be sufficient to set aside the sale of the personal property. Both applications are denied.